Warren HAUGHT, 710 Corporation,
Top Drilling Corporation and HAH
Petroleum, Inc., Appellants,

v.

AGRICULTURAL PRODUCTION
CREDIT ASSOCIATION,
Appellee.

No. 12–99–00448–CV.

Court of Appeals of Texas,
Tyler.

Dec. 29, 2000.

Deborah Race, Tyler, for appellant.

Samuel Baxter, Dallas, for appellee.

° Panel consisted of HADDEN, J., WORTHEN, J., and RAMEY, Jr., Retired Chief Justice, Twelfth Court of Appeals, sitting by assignment.

HADDEN, Justice.

This is an interlocutory appeal from the denial of special appearances sought by Warren Haught, 710 Corporation, Top Drilling Corporation and HAH Petroleum, Inc. (sometimes hereinafter referred to collectively as the "Haught entities") in a suit brought against them by Agricultural Production Credit Association ("AgPCA"). We reverse the trial court's order denying the special appearances and dismiss the suit as to these defendants for lack of personal jurisdiction.

## BACKGROUND

Agricultural Production Credit Association, a Texas company, loaned approximately $3,000,000.00 to Hughes Resources ("Hughes"), a Nevada corporation. Hughes defaulted on the loan and AgPCA obtained a judgment against the corporation in March of 1997. In 1999, AgPCA brought suit to enforce the prior default judgment. In its petition, it also seeks actual and punitive damages against seventeen new defendants, including the Haught entities, Appellants in this case.[1] AgPCA

---

1. Only two of those defendants reside in Texas—a former officer and consultant to Hughes who resides in Dallas and a former officer who resides in Richardson. Neither is an appellant in the case before us.

alleges RICO violations, fraudulent transfer, breach of fiduciary duty, and imposition of constructive trust. It also asserts that Warren Haught was the alter ego of Hughes.

Appellant corporations are all owned by Warren Haught's family, but not by Haught himself, although he is a consultant to two of them. In 1995, the Haught entities sold oil and gas properties to Hughes for $3,000,000.00, to be paid in $1,000,000.00 installments. Hughes also transferred convertible preferred stock to a company owned by the Haught family, in partial consideration for the purchase. It was agreed that in the event of Hughes' default in making the installment payments for the oil and gas properties, the properties would be transferred back to Appellant in full satisfaction of the obligation. As a part of the agreement, Warren Haught became a director of Hughes and the president of its oil and gas division. In 1996, Hughes defaulted on its $3,000,000.00 payment. The oil and gas properties were thereupon reconveyed to the Haught entities. Warren Haught then resigned from the board of directors and as president of the oil and gas division. This series of events all occurred before AgPCA filed suit against Hughes (now Phoenix Resources Technologies, Inc. or "PRTI").

AgPCA contends that the Haught entities were involved in the intentional fraudulent transfer of Hughes' assets and were involved in a conspiracy to transfer the assets, all of which was intentionally directed at a Texas organization (AgPCA), giving the Texas district court jurisdiction over the Haught entities. The Haught entities, none of which are from Texas, argue that a Texas court does not have jurisdiction over them, and thus filed these special appearances. After denying the special appearances, the trial court filed extensive and detailed findings of fact and conclusions of law.

The Haught entities ask us to review the following issues on appeal. Did AgPCA plead a prima facie showing of jurisdiction over the nonresident Haught defendants? If so, did the Haught defendants thereafter negate all bases of personal jurisdiction, namely nationwide service of process under RICO, specific jurisdiction based on conduct allegedly aimed at causing injury in Texas, and general jurisdiction as to Warren Haught, individually, based on AgPCA's allegation of alter ego?

### STANDARD OF REVIEW

■ The plaintiff has the burden to plead a prima facie showing of jurisdiction. *M.G.M. Grand Hotel, Inc. v. Castro,* 8 S.W.3d 403, 408 (Tex.App.—Corpus Christi 1999, no pet.). Defendants asserting lack of personal jurisdiction have the burden of negating *all* bases of jurisdiction. *De Prins v. Van Damme,* 953 S.W.2d 7, 14 (Tex.App.—Tyler 1997, writ denied). On appeal, the appellate court reviews the record to determine if the defendants negated every possible ground for personal jurisdiction. *Id.*

■ The standard of review of a plea to the jurisdiction is a factual sufficiency review. *Id.* at 13. In our review, we must view all of the evidence before the trial court contained in the reporter's record on the jurisdiction issue even where, as here, the trial court made findings of fact and conclusions of law. *Linton v. Airbus Industrie,* 934 S.W.2d 754, 757 (Tex.App.—Houston [14th Dist.] 1996, writ denied). We may reverse the decision of the trial court only if its finding is so against the overwhelming weight and preponderance of the evidence as to be clearly erroneous and manifestly unjust. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). As a reviewing court, we cannot substitute our conclusions for those of the trial court. *Brown v. The State Bar,* 960 S.W.2d 671, 674 (Tex.App.—El Paso 1997, no writ). If there is sufficient competent evidence of probative force to support the challenged findings, they must be sustained. As an appellate court, we do not interfere with the trial court's resolution of conflicts in

the evidence, or pass on the weight or credibility of the witnesses' testimony. Further, where there is conflicting evidence, the findings of the trial court are generally regarded as conclusive. *Id.*

When the trial court makes conclusions of law, our review of such conclusions is de novo, *Linton,* 934 S.W.2d at 757, and we are required to review the uncontroverted evidence in the record, even if not reflected in the court's findings of fact, to determine whether the conclusions of law by the trial court are supported by the evidence as a whole. *Middleton v. Kawasaki Steel Corp.,* 687 S.W.2d 42, 44 (Tex.App.—Houston [14th Dist.] 1985), writ ref'd n.r.e., 699 S.W.2d 199 (Tex.1985). This is true unless the underlying facts are undisputed or otherwise established. *Preussag Aktiengesellschaft v. Coleman,* 16 S.W.3d 110, 113 (Tex. App.—Houston [1st Dist.] 2000, pet. filed).

### PRIMA FACIE SHOWING OF JURISDICTION

The Haught entities first argue that AgPCA failed to make a prima facie showing of jurisdiction. This assertion may be true; however, the Haught entities waived this complaint because they did not raise the issue in a motion to quash, as required by *Kawasaki Steel Corp. v. Middleton,* 699 S.W.2d 199, 203 (Tex.1985). *Kawasaki* stands for the proposition that defective jurisdictional allegations in a petition must be challenged by a motion to quash, not by special appearance. 699 S.W.2d at 203.

### RICO JURISDICTION

The federal Racketeer Influenced and Corrupt Organization Act ("RICO") prohibits "racketeering activity." 18 U.S.C. § 1962 (1999). Racketeering includes fraud, which AgPCA has pleaded in this case. 18 U.S.C. § 1961 (1999). Before we discuss the RICO jurisdictional question, we feel compelled to note that based upon the evidence in the record before this Court, neither Warren Haught individually, nor the Haught corporations, were involved in any type of fraudulent activity. AgPCA loaned Hughes $3,000,000.00 in 1993. The Haught entities sold its oil and gas properties to Hughes two years later. In other words, the properties were not and could not have been collateral for the AgPCA loan. Warren Haught was not an owner of these properties, nor was he a party to the agreement. The contract provided that if Hughes defaulted on its payments to the Haught entities, they had the contractual right to a reversion of the properties. Specifically, the contract stated, "If the payments listed above are not made in a timely manner the properties will be reassigned to HAH or its designees." When Hughes failed to pay the agreed upon sale price, the Haught entities repossessed the properties, as per the original contract. The Haught entities did only what the sale agreement provided.

Turning now to the jurisdictional complaint, the Haught entities make the assertion that even if they were involved in a racketeering scheme, RICO does not confer jurisdiction upon the Smith County District Court. Section 1965 of RICO provides for nationwide service of process when one of the RICO defendants is subject to the court's personal jurisdiction. 18 U.S.C. § 1965. AgPCA maintains that state courts have concurrent jurisdiction with federal courts over civil RICO claims, and since the court has jurisdiction over at least one other RICO defendant, it also has jurisdiction over the Haught entities. Appellants argue, on the other hand, that the statute provides for nationwide service of process only when the suit is brought in a **federal** court.

There is very little case law on this issue. However, there are two cases which indicate that Congress did not intend for the RICO long-arm statute to be utilized by state courts, even though, as AgPCA correctly maintains, state courts do enjoy concurrent jurisdiction with federal courts over civil RICO claims. The Fourth Circuit Court of Appeals states in

*Brandenburg v. Seidel,* 859 F.2d 1179, 1194 (4th Cir.1988), that "the fact that the statute's expansive venue and service-of-process provisions are applicable only in federal court has no significance here, for the state courts retain the authority to promulgate procedural rules for their own courts, subject only to constitutional limitations." And the U.S. Supreme Court points out that there are several federal statutes, including RICO, in which the procedural mechanisms (such as RICO's extended venue and service-of-process provisions) are applicable only in federal court. *Tafflin v. Levitt,* 493 U.S. 455, 466, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990). We hold, therefore, that the trial court erred when it concluded that "the court has personal jurisdiction over Warren Haught, 710 Corporation, Top Drilling Corporation, and HAH Petroleum, Inc. under the federal civil RICO statute, 18 U.S.C. § 1965 (1999)."

### General and Specific Jurisdiction

The Haught entities further argue that the trial court has neither general nor specific jurisdiction over them. A court may assert personal jurisdiction over a nonresident defendant only if the requirements of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Texas long-arm statute are satisfied. *See Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 413–14, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). The Texas long-arm statute allows a court to exercise personal jurisdiction over a nonresident defendant who does business in Texas. *See* TEX.CIV. PRAC. & REM.CODE § 17.042 (Vernon 1997). In addition to several specific activities that constitute doing business in Texas, the statute provides that "other acts" by the nonresident can satisfy the requirement. *See id.; Guardian Royal Exchange Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991).

The "other acts" necessary to satisfy the Texas long-arm statute extend only as far as federal due process requirements will allow. *See Guardian Royal Exch.,* 815 S.W.2d at 226. Thus, these federal due process requirements define the parameters of our review. The questions we must consider include "(1) whether the nonresident defendant has purposely established 'minimum contacts' with the forum state; and (2) if so, whether the exercise of jurisdiction comports with 'fair play and substantial justice.'" *Id.* (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475–76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).

A nonresident defendant's contacts with a forum can give rise to either general or specific jurisdiction. " 'General jurisdiction' is personal jurisdiction based on a defendant's contacts with the forum that are unrelated to the controversy ... To exercise general jurisdiction, the court must determine whether 'the contacts are sufficiently systematic and continuous as to support a reasonable exercise of jurisdiction.'" *Southmark Corp. v. Life Investors, Inc.,* 851 F.2d 763, 772 (5th Cir.1988). If a plaintiff seeks to pierce the corporate veil through theories of alter ego, insider fraud, or use of the corporation for illegal purposes, as in this case, then the trial court can base jurisdiction over the corporate agent on the contacts of the corporation. *Intermed Laboratories, Inc. v. Felda,* 898 F.Supp. 417, 420 (E.D.Tex.1995). However, occasional travel by corporate personnel to Texas is insufficient by itself to establish continuous and systematic contact. *Preussag Aktiengesellschaft,* 16 S.W.3d at 124.

" 'Specific jurisdiction,' on the other hand, is personal jurisdiction based on contacts with the forum that are related to the particular controversy. Even a single purposeful contact may, in a proper case, be sufficient to meet the requirement of minimum contacts when the cause of action arises from the contact. But to exercise specific jurisdiction, the court must examine the relationship among the

defendant, the forum, and the litigation." *Guardian Royal Exch.,* 815 S.W.2d at 228. The defendant's activities must have been purposefully directed to the forum and the litigation must result from the alleged injuries that arise out of or relate to those activities. *Nat'l Indus. Sand Assoc. v. Gibson,* 897 S.W.2d 769, 774 (Tex.1995). A nonresident can expect to be haled into a Texas court if he commits acts outside the state with the intent that harm be done within. *See Calder v. Jones,* 465 U.S. 783, 789–91, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). The defendant's purposeful conduct must have caused the contact, not the unilateral activity of the plaintiff or others. *See Guardian Royal Exch.,* 815 S.W.2d at 227. This requirement that a defendant purposefully avail himself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws, ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person. *See Burger King,* 471 U.S. at 475, 105 S.Ct. 2174. In addition to the above requirements, the assumption of jurisdiction by a Texas court must not offend traditional notions of fair play and substantial justice, consideration being given to the quality, nature and extent of the activity in Texas, the relative convenience of the parties, the benefits and protection of the laws of the forum state afforded the respective parties, and the basic equities of the situation. *Siskind v. Villa Found. for Educ., Inc.,* 642 S.W.2d 434, 436 (Tex.1982).

### Findings of Facts and Conclusions of Law

The Haught entities challenge the following findings of fact:

. . .

5. [The oil and gas properties] were valued by Hughes Resources in excess of $23 million.

6. At the time of the transaction, the shares of convertible stock in Hughes Resources were worth at least $8 million.

7. The July 1995 agreement between Hughes Resources, Top Drilling and HAH Petroleum for the West Virginia oil and gas properties contained a provision stating that, if PRTI's predecessor [Hughes] failed to meet certain obligations to Haught, including the payment of certain dividends, control of PRTI's predecessor would go to Haught, Top Drilling and HAH Petroleum.

8. By October 1995, Hughes Resources was in default on its debt obligation to AgPCA.

9. Substantially all of the assets of Hughes Resources were secured as collateral for the AgPCA debt in the amount of $3,052,114 and another debt of Hughes Resources in the amount of $363,628.

10. By October 1995, the current liabilities of Hughes Resources exceeded its current assets by $1,517,894.

11. Hughes Resources reports that should acceleration of the AgPCA debt occur such an event would have a significant impact on Hughes Resources' ability to meet its current obligations and liabilities and affect[sic] the status of Hughes Resources as a going concern.

12. On December 25, 1995, Warren Haught, Top Drilling and HAH Petroleum waived Hughes Resources' performance of the obligations referenced above in paragraph 7 and waived their right to take control of Hughes Resources.

13. On February 1, 1996, Hughes Resources changed its name to Phoenix Resources Technologies, Inc. ("PRTI").

14. On April 24, 1996, NASDAQ halted public trading of PRTI stock due to PRTI's delinquency in filing its required SEC statements. As a re-

sult, the Haught Defendants' convertible stock becomes worthless.

15. On August 13, 1996, the Haught Defendants completed a deal with PRTI, where they exchange their worthless convertible stock for the West Virginia Properties, which are worth between $8 million to $23 million.

. . .

17. At the time of the transfer, PRTI remained in default on the AgPCA debt.

. . .

21. The value of the consideration received by the PRTI for the West Virginia properties was not reasonably equivalent to the assets transferred.

22. PRTI was insolvent prior to and on the date of the August 1996 transfer and remained insolvent after the transfers were made.

. . .

24. AgPCA was the target of the Haught Defendants' intentional fraudulent transfer of PRTI's assets.

25. The Court has personal jurisdiction over the two other defendants George Smith and Marvin Lewis, who are Texas residents.

26. George Smith served as a director and the Secretary of PRTI from at least February 1995 to August 1996.

27. Marvin Lewis served as the Assistant Secretary and legal advisor of PRTI from at least March 1995 to August 1996.

28. No other court in the United States would have jurisdiction over all of the defendants to this action.

. . .

34. Warren Haught engaged in insider self-dealing. Warren Haught exercised his control over PRTI by negotiating the exchange of worthless preferred shares of PRTI owned by companies controlled by the Haught Family for the West Virginia oil and gas properties, which were worth anywhere between $8 million and $23 million.

35. The burden of AgPCA to pursue its claims outside of Texas is extreme. AgPCA would have to litigate similar, if not identical, claims in numerous states, including Texas, West Virginia, Colorado, Arizona, Nevada, Washington, Louisiana, and Ohio.

36. Texas' interest in this matter is extremely high. AgPCA is attempting to enforce a judgment entered by this Court. AgPCA's principle(sic) place of business is Texas. PRTI's debt obligation was payable in Smith County, Texas.

. . .

38. Texas is the most efficient forum.

The Haught entities also challenge the following conclusions of law:

. . .

2. The Haught Defendants bore the burden of negating all bases of personal jurisdiction. The Haught Defendants failed to do so.

. . .

4. The August 13, 1994[sic] transfer of the approximately 300 West Virginia oil and gas wells was fraudulent and purposefully directed at defrauding AgPCA in Smith County, Texas.

5. The Haught Defendants' fraudulent transfer damaged AgPCA in Texas and it was reasonably foreseeable that the fraudulent transfer would cause AgPCA harm in Texas.

. . .

7. This litigation results in part from AgPCA's injuries arising out of and relating to the Haught Defendants' fraudulent activities.

8. The Court has personal jurisdiction over Warren Haught, 710 Corporation, Top Drilling Corporation, and

HAH Petroleum under *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984).

9. PRTI has minimum contacts with Texas.

. . .

14. The Court has personal jurisdiction over at least Defendants George Smith and Marvin Lewis.

15. The Court has personal jurisdiction over Warren Haught, 710 Corporation, Top Drilling Corporation, and HAH Petroleum, Inc. under the federal civil RICO statute, 18 U.S.C. § 1965 (1999).

16. Warren Haught was the alter ego of PRTI.

17. Warren Haught perpetrated a fraud on AgPCA and engaged in insider fraud and self-dealing as a director and officer of PRTI.

18. Warren Haught used PRTI for illegal purposes in defrauding AgPCA.

19. PRTI's actions in Texas and PRTI's minimum contacts with Texas are attributable to Warren Haught.

20. The Court's exercising jurisdiction over the Defendants would not offend traditional notions of fair play and substantial justice.

### Special Appearance Hearing

The only witness to testify at the special appearance hearing was Warren Haught. He testified that he lives in West Virginia and that in the last ten years, he has been in Texas two times. He was in Dallas for two days to attend an Excel Communications meeting. On another occasion, he flew to Houston to look at products owned by Hughes. This was a very brief visit before he went on to Louisiana. Warren Haught stated that he does not own any real or personal property in Texas. He does not sell, advertise, or have agents, employees or other representatives in Texas. HAH Petroleum is owned by his two daughters and wife. 710 Corporation is owned by his wife. Top Drilling is a solely owned subsidiary of 710 Corporation. Haught acts as a consultant for HAH and Top Drilling. None of the Haught entities do any business or own any property in Texas.

Warren Haught testified that the agreement between Hughes and 710, HAH Petroleum and Top Drilling was executed on July 31, 1995. The contract was not entered into in Texas. The Haught entities sold over three hundred seventy West Virginia oil and gas wells, a pipeline system and some drilling rigs to Hughes for $3,000,000.00 and $2,000,000.00 in convertible preferred stock. Haught was aware that Hughes had a research study done that placed a value on the West Virginia properties at $23,000,000.00, but did not agree with it. When the Haught entities did not receive the $3,000,000.00, they transferred the stock[2] back to Hughes and took possession of the oil and gas properties, as per the original agreement. The settlement agreement was executed on August 13, 1996, in which the properties were transferred back to the Haught entities for non-payment. According to Warren Haught, none of the Haught entities had a relationship with AgPCA, and they never committed any act for the purpose of intentionally hurting AgPCA.

Warren Haught asserted that he never owned stock or had voting control in Hughes. He acted as a director of Hughes (president of the oil and gas division) from August of 1995 through August of 1996, but he was not authorized to sign checks and he earned no compensation. He was aware of the debt to AgPCA, but believed that the Wood Products Division's assets secured the debt. He asserted that he did not know that Hughes was losing money and believed, in fact, that it was

---

2. The Haught entities never converted the convertible preferred stock to common stock. Warren Haught testified that he did not know the value of the stock when it was transferred back to Hughes.

making a profit. He did not know in October of 1995 that Hughes was in default on the AgPCA loan. Rather, he had been informed that it was current. Warren Haught testified that he did not know anything specific about the company's other debts. He did not have responsibility for the SEC filings, but while he was a director, he did review one SEC filing. During the year in which he was on the board of Hughes, the corporation never held a shareholders' meeting.

Four exhibits were admitted into evidence—the 1995 agreement to sell the oil and gas properties to Hughes; an assignment of oil and gas producing properties from HAH Petroleum to Hughes; a second assignment from HAH Petroleum to Hughes of additional oil and gas properties; and the 1996 "settlement agreement" between the Haught entities and Hughes to rescind the sale of the oil and gas properties, which included the transfer back of the disputed oil and gas properties. No one testified on behalf of AgPCA.

### Analysis

We must now decide if the Appellants negated both general and specific jurisdiction. Within that process, we must also review the trial court's findings in question and determine if they are supported by the evidence. As we stated earlier, if there is sufficient competent evidence of probative force to support the challenged findings, they must be sustained.

■ At the onset, we note that there is no evidence in the record to support findings of fact numbers 8, 9, 10, 11, 13, 14, 17, 18, 20, 21, 22, 23, 24, 25, 26, 27, 28, 35, 36, and 38. In regard to finding number five, AgPCA asked Warren Haught if he would value the properties at twenty-three million dollars and he replied, "I would not look at it at that value." When asked what value he would put on the property, he testified, "Totally, somewhere between six to eight million dollars." This was the only evidence as to the value of the properties and the trial court's finding that the property was valued at twenty-three million dollars is against the great weight and preponderance of the evidence.

■ In finding number six, the court found that the shares of convertible stock in Hughes were worth at least $8 million. The evidence does not support this finding. AgPCA asked Haught if the stock wasn't worth eight million dollars, and Haught responded, "I'm not sure how you would value it. It would depend on other things, various things as to what the value would be." There was no evidence introduced to establish AgPCA's valuation of the stock.

■ Finding number seven states, "The July 1995 agreement between Hughes Resources, Top Drilling and HAH Petroleum for the West Virginia oil and gas properties contained a provision stating that if PRTI's predecessor [Hughes] failed to meet certain obligations to Haught, including the payment of certain dividends, control of PRTI's predecessor would go to Haught, Top Drilling and HAH Petroleum." Finding number twelve states that the Haught defendants waived Hughes' obligations under the 1995 agreement and waived their right to take control of Hughes. Haught introduced the July 31, 1995, agreement and it contained no such provision. And when questioned about such a waiver, Haught replied, "I don't believe that's correct." Haught asserted that he did not understand the waiver of rights in the way AgPCA explained. AgPCA introduced no evidence supporting its allegation of such a waiver. Thus, findings seven and twelve are against the great weight and preponderance of the evidence.

■ Finding fifteen, regarding the 1996 settlement agreement, is also against the great weight and preponderance of the evidence. Haught introduced the settlement agreement between the parties, and explained that the parties reached this agreement after Hughes failed to pay the money called for in the original agreement for the property. When Hughes failed to

pay, they reached an agreement for the properties Haught originally transferred to Hughes to be reconveyed to Haught and the convertible preferred stock to be reconveyed to Hughes. AgPCA offered no evidence that Hughes and Haught exchanged "their worthless convertible stock for the West Virginia properties, which are worth between $8 million to $23 million."

■ The evidence does not support finding number thirty-four that Warren Haught engaged in insider self-dealing. Instead, the undisputed evidence before the court established that the Haught entities, not Haught, entered into a business arrangement in 1995, which called for a transfer of certain properties to Hughes in exchange for payment of $3,000,000.00 and a certain amount of convertible preferred stock. Warren Haught became a director of the company under the 1995 agreement. When Hughes failed to make its payments, the Haught entities and Hughes entered into a settlement agreement wherein the properties were returned to the Haught entities and Warren Haught severed his ties with the company.

After reviewing the record, we conclude that the findings of fact challenged by the Haught entities are not supported by the evidence and are, in fact, against the great weight and preponderance of the evidence. Consequently, the conclusions of law which are based upon those findings of fact are also incorrect.

### Appellants' Burden to Negate All Bases of Jurisdiction

■ We turn now to the issue of whether the Haught entities met their burden of negating all bases of jurisdiction. As we earlier stated, the RICO long-arm provision may not be used to hale nonresidents into a Texas court when that court is a state rather than federal court. In regards to general jurisdiction, Warren Haught testified that neither he nor the corporate Appellants had anything other than brief contacts with the State of Texas, none involving the subject in dispute. Haught's undisputed testimony shows that

their contacts were not sufficiently systematic and continuous as to support a reasonable exercise of jurisdiction. *See South-mark Corp.*, 851 F.2d at 772. Further, Warren Haught asserted that the Haught entities entered into a contract with Hughes whereby he became a director of the company. In that contract, it was agreed that if Hughes did not pay for the properties, the company would transfer them back to the Haught entities, which is exactly what happened. The Haught entities simply acted upon a provision of their contractual agreement. Additionally, Warren Haught testified that he never owned stock or had voting control in Hughes. He acted as a director of Hughes from August of 1995 through August of 1996, but he was not authorized to sign checks and he earned no compensation. He was aware of the debt to AgPCA, but believed that the Wood Products Division's assets secured the debt. He did not know that Hughes was losing money and believed, in fact, that it was making a profit. He did not know that Hughes was in default on the AgPCA loan. Rather, he had been informed that it was current. Furthermore, Warren Haught did not own any of the properties at issue, nor was he a party to the sales agreement. Warren Haught's undisputed testimony negates AgPCA's contention that Texas has jurisdiction over the Haught entities upon the theories of alter ego, insider fraud, or use of the corporation for illegal purposes. In regard to specific jurisdiction, Warren Haught testified to the above, as well as to the fact that none of the Haught entities had a relationship with AgPCA, and that they never committed any act for the purpose of intentionally hurting AgPCA. This testimony is also undisputed. We hold, therefore, that the Haught entities met their burden of negating all bases of jurisdiction.

Accordingly, we overrule the trial court's finding of personal jurisdiction over the Haught entities and reverse its denial of special appearances. We therefore dis-

miss this case as to those defendants for lack of personal jurisdiction over Warren Haught, 710 Corporation, Top Drilling Corporation and HAH Petroleum, Inc.