COURT
OF APPEALS
SECOND
DISTRICT OF TEXAS
FORT WORTH
NO. 2-03-032-CV
 
DR. EVANGELOS YFANTIS                                                            
APPELLANT
V.
MICHAEL BALLOUN, RAINIER                                                       
  APPELLEES
COMPANY AND PATTY BALLOUN
------------
FROM THE 352
ND DISTRICT COURT OF
TARRANT COUNTY
------------
OPINION
------------
Introduction
This is an interlocutory appeal from the
trial court's order denying Dr. Evangelos Yfantis's special appearance. In four
issues, Yfantis complains that the trial court erred in denying his special
appearance. We will reverse the trial court's judgment and render judgment
dismissing the case against Yfantis for lack of personal jurisdiction.
Background Facts and
Procedural History
John Strength, Bart Malone, and Robert
Nolen are Texas residents and co-owners of Makarios Capital Management, LLC
("MCM"), a Texas corporation. Eye-Gate Technologies
("Eye-Gate") is a Nevada corporation with its principal place of
business in Texas. Evangelos Yfantis is a resident of Nevada and the sole
shareholder and director of Statistical and Software Analysts Incorporated
("SSAI"), a Nevada corporation.
In the late 1990s, Yfantis invented a
video telephone that could be used over the internet. In 1997, Sharon Vanshell,
a college friend, informed him that Strength was interested in his invention.
Yfantis and Strength arranged a meeting in Las Vegas. Due to his work load,
however, Yfantis declined the opportunity to work with Strength.
In 1999, Strength made several attempts to
contact Yfantis, but Yfantis did not return his calls. Vanshell again contacted
Yfantis and asked him to work with Strength. Yfantis arranged a meeting with
Strength at his office in Nevada. At this meeting, Strength assured Yfantis that
he had the infrastructure to market the video telephone and proposed that MCM
and SSAI enter into a $500,000 licensing agreement. Hesitant to rush into an
agreement, Yfantis insisted that Strength take the video phone back to Dallas
and try it out. Yfantis purchased a computer and software for Strength so that
he could utilize the phone. Strength then returned to Dallas with the computer
and the video phone.
Two weeks later, Strength returned to
Nevada and notified Yfantis that he wanted to make a deal. MCM's attorney
prepared a one-year licensing agreement and forwarded it to SSAI in Nevada. The
agreement contained a choice of law provision providing that the agreement would
be governed by Nevada law. Under the agreement, MCM was to pay the licensing fee
in three installments. The first installment of $25,000 was to be paid upon the
execution of the agreement. A second payment of $275,000 was due May 2, 2000,
with the final payment of $200,000 being due two months after the agreement was
executed.
Around the same time, Strength and Malone
approached Michael Balloun, President of Rainier Company, and requested a loan
for $290,000 to purchase a shell corporation by the name of I-SIM Corporation
("I-SIM"). Strength and Malone planned to use I-SIM to market
Yfantis's video telephone technology. They stated that they needed $35,000 as
escrow to hold I-SIM until closing. Balloun, acting on behalf of Rainier, agreed
to provide the funding.(1) To evidence their
agreement, Strength, Malone, and Nolen signed a promissory note payable to
Balloun.
On December 17, 1999, Balloun loaned
Strength and Malone $35,000 to cover the required escrow. On February 15, 2000,
Balloun loaned them the remaining $255,000 of the purchase price.(2)
On May 9, Malone and Strength called
Balloun and requested an additional $215,000. They told Balloun that MCM had
written a check for $275,000 to Yfantis, which would not clear because of
insufficient funds.(3) Balloun again loaned Smith
and Malone the necessary funds. MCM repaid approximately $100,000 of the
$215,000 a short time later; however, the balance remains unpaid.
In the fall of 2001, Balloun learned that
Strength and Malone had not obtained the shell corporation with the loaned funds
as promised. On February 8, 2002, Balloun filed suit against MCM, Malone,
Strength, and Nolen alleging claims for breach of contract, conversion, common
law fraud, tortious interference with contract, civil conspiracy, and negligent
misrepresentation. On May 9, 2002, Balloun amended its petition to include a
claim against Yfantis for constructive trust. In its amended petition, Balloun
contended that "[t]o the extent Defendant Dr. Evangelos Yfantis received
any of the monies of Plaintiffs which were delivered to representatives of MCM
on or about May 10, 2000, then such funds were received under circumstances
justifying the imposition of a constructive trust." Balloun argued that
Yfantis received the monies by mistake and/or some other wrong or conduct that
resulted in his unjust enrichment.
Yfantis filed a special appearance
alleging that the Texas courts had neither general nor specific jurisdiction
over him. Balloun filed a response and a supplemental first amended petition. In
this supplement, it alleged that the trial court had general jurisdiction over
Yfantis because he had engaged in systematic and continuous contacts with Texas.
Specifically, Balloun contended that over a two-year period, Yfantis had engaged
in substantial commercial transactions and entered into contracts with Texas
residents. Alternatively, it pleaded that he had purposefully traveled to Texas
in 2000 and 2001 in connection with the sale and licensing of his video
telephone technology. Balloun also alleged that he had purposeful, systematic,
and continuous contacts with these Texas residents by means of written
correspondence, phone calls, e-mails, and video telephoning.
At the special appearance hearing, Bart
Malone testified about the contacts that Yfantis had with MCM and Eye-Gate over
the course of the agreement. Malone stated that Yfantis had been to Texas on
three occasions and that he had maintained regular contact with MCM via e-mail,
telephone, and video phone. He further testified that Yfantis was both a
shareholder in and director of Eye-Gate. Yfantis offered no live testimony at
the hearing; however, the trial court did admit his deposition testimony into
evidence.
After hearing the evidence and arguments
of counsel, the trial court denied Yfantis's special appearance without entering
findings of fact or conclusions of law. Yfantis then filed this interlocutory
appeal.
Standard of Review
Whether a court has personal jurisdiction
over a defendant is a question of law. BMC Software Belgium, N.V. v.
Marchand, 83 S.W.3d 789, 794 (Tex. 2002). Thus, the trial court's
determination to grant or deny a special appearance is subject to de novo
review. Id. When reviewing an oral granting or denying of a special
appearance, we review all of the evidence. Fish v. Tandy Corp., 948
S.W.2d 886, 892 (Tex. App.--Fort Worth 1997, writ denied). Where, as here, the
trial court does not issue findings of fact and conclusions of law and the
record includes the reporter's and clerk's records, we review the trial court's
resolution of disputed fact issues for legal and factual sufficiency and its
legal conclusions de novo. BMC Software, 83 S.W.3d at 794-95.
Personal Jurisdiction
Texas courts may assert personal
jurisdiction over a nonresident defendant only if the Texas long-arm statute
authorizes jurisdiction and the exercise of jurisdiction is consistent with
federal and state due process standards. Guardian Royal Exch. Assurance,
Ltd. v. English China Clays, P.L.C., 815 S.W.2d 223, 226 (Tex. 1991). The
Texas long-arm statute reaches "as far as the federal constitutional
requirements of due process will allow." Id. Thus, the Texas
long-arm statute requirements are satisfied if exercising jurisdiction comports
with federal due process limitations. Id.
The plaintiff bears the initial burden of
pleading sufficient allegations to bring a nonresident defendant within the
provisions of the long-arm statute. BMC Software, 83 S.W.3d at 793; McKanna
v. Edgar, 388 S.W.2d 927, 930 (Tex. 1965). A defendant who challenges a
trial court's exercise of personal jurisdiction through a special appearance
bears the burden of negating all jurisdictional bases. Kawasaki Steel Corp.
v. Middleton, 699 S.W.2d 199, 203 (Tex. 1985); Fish, 948 S.W.2d at
891. We rely on precedent from the United States Supreme Court as well as our
own state's decisions in determining whether a nonresident defendant has met its
burden. BMC Software, 83 S.W.3d at 795.
Under the Due Process Clause of the
Fourteenth Amendment, jurisdiction is proper if a nonresident defendant
established "minimum contacts" with Texas and maintenance of the suit
does not offend "traditional notions of fair play and substantial
justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.
Ct. 154, 158 (1945). The purpose of the minimum-contacts analysis is to protect
the defendant from being haled into court when its relationship with Texas is
too attenuated to support jurisdiction. Schlobohm v. Schapiro, 784
S.W.2d 355, 357 (Tex. 1990). Accordingly, we focus upon the defendant's
activities and expectations in deciding whether it is proper to call him before
a Texas court. Id.
The minimum-contacts analysis requires
that a defendant "purposefully avail" himself of the privilege of
conducting activities within Texas, thus invoking the benefits and protections
of our laws. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475-76, 105
S. Ct. 2174, 2183-84 (1985). The defendant's activities, whether they consist of
direct acts within Texas or conduct outside Texas, must justify a conclusion
that the defendant could reasonably anticipate being called into a Texas court. World-Wide
Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S. Ct. 559, 567 (1980).
A defendant is not subject to jurisdiction here if his Texas contacts are
random, fortuitous, or attenuated. See Guardian Royal, 815 S.W.2d at
226. Nor can a defendant be haled into a Texas court for the unilateral acts of
a third party. Id. at 227. It is the quality and nature of the
defendant's contacts, rather than their number, that is important to the
minimum-contacts analysis. Am. Type Culture Collection, Inc. v. Coleman,
83 S.W.3d 801, 808 (Tex. 2002), cert. denied, 123 S. Ct. 1271 (2003).
A defendant's contacts with a forum can
give rise to either specific or general jurisdiction. For a court to exercise
specific jurisdiction over a nonresident defendant, two requirements must be
met: (1) the defendant's contacts with the forum must be purposeful, and (2) the
cause of action must arise from or relate to those contacts. Guardian Royal,
815 S.W.2d at 227. When specific jurisdiction is asserted, the minimum
contacts analysis focuses on the relationship among the defendant, the forum,
and the litigation. Id. at 228.
General jurisdiction, on the other hand,
allows a forum to exercise jurisdiction over a defendant even if the cause of
action did not arise from or relate to a defendant's contacts with the forum. Helicopteros
Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-16, 104 S. Ct.
1868, 1872-73 (1984); Guardian Royal, 815 S.W.2d at 228. General
jurisdiction is only present, however, when a defendant's contacts with a forum
are "continuous and systematic," a more demanding minimum-contacts
analysis than specific jurisdiction. Guardian Royal, 815 S.W.2d at 228.
General Jurisdiction
In his second issue, Yfantis asserts that
the trial court erred in denying his special appearance because Balloun failed
to show that he had continuous or systematic contacts with Texas. After
reviewing the record in this case, we conclude that Yfantis's contacts with the
state were neither substantial nor systematic and continuous. The undisputed
evidence clearly establishes that Yfantis: 1) is not, and has never been, a
resident of Texas; 2) does not have an office or principal place of business in
Texas; 3) does not have or maintain a designated agent for service of process
within the state; 4) does not do business in Texas; 5) resides in Las Vegas,
Nevada; and 6) is the sole shareholder and director of SSAI, a corporation
incorporated in Nevada. Although he entered into a licensing agreement with MCM,
a Texas corporation, the agreement was solicited, negotiated, and signed by
Yfantis in Nevada. The video telephone was delivered to MCM's representatives in
Nevada, and the consideration for the agreement was hand-delivered to Yfantis in
Nevada. Further, the licensing agreement contained a choice of law clause
indicating that it would be construed under and in accordance with Nevada law.
Thus, the mere fact that Yfantis entered into this contract with a Texas
corporation does not support the trial court's exercise of general jurisdiction
over him. See Coleman, 83 S.W.3d at 808 (holding that contract signed
and performed by defendant in Maryland did not support finding of general
jurisdiction); see also U-Anchor Adver., Inc. v. Burt, 553 S.W.2d 760,
763 (Tex. 1977) (holding that contract solicited, negotiated, and consummated in
Oklahoma did not indicate or support an inference that defendant intended to
exercise the privilege of doing business in Texas), cert. denied, 434
U.S. 1063 (1978).
Yfantis did make at least two trips to
Texas in connection with the licensing agreement,(4)
and he maintained regular correspondence with MCM and Eye-Gate via telephone,
e-mail, and video phone throughout the duration of their agreement.(5)
Although these actions may have been purposefully directed at Texas, they were
made in connection with the licensing agreement. Thus, standing alone, these
contacts are not continuous and systematic enough to constitute
"substantial activities." See Dalton v. R & W Marine, Inc.,
897 F.2d 1359, 1362 n.3 (5th Cir. 1990) (holding that mere purchases,
and trips related thereto, even if they occurred regularly, were not, standing
alone, a sufficient basis for the assertion of general jurisdiction); see
also Garner v. Furmanite Australia Pty., Ltd., 966 S.W.2d 798, 802 (Tex.
App.--Houston [1st Dist.] 1998, pet. denied) (holding no general
jurisdiction existed over individual who made eight to ten visits to Texas over
five-year period for single purpose); Hotel Partners v. Craig, 993
S.W.2d 116, 121 (Tex. App.--Dallas 1994, writ denied) (holding that defendant's
meetings and correspondence with the plaintiff were purposefully directed at
Texas, but were insufficient to support the exercise of general jurisdiction).
Balloun also contends that Yfantis's
position as a shareholder and officer/director of Eye-Gate conferred
jurisdiction upon the court. Generally, a court may not assert general
jurisdiction over an individual based on that individual's association with a
corporation unless the corporation is the alter ego of the individual. Vosko
v. Chase Manhattan Bank, N.A., 909 S.W.2d 95, 99 (Tex. App.--Houston [14th
Dist.] 1995, writ denied). Here, the record contains no evidence that Eye-Gate
was Yfantis's alter ego. There is also no evidence that Yfantis was present at
the time of his alleged election to the position of officer/director, that he
participated in any of the board of directors meetings, or that he took any
actions on behalf of Eye-Gate. As a matter of fact, in his deposition, Yfantis
stated that he was not even aware that he had been elected as a director or
officer of Eye-Gate. Further, the record reveals that he did not purchase the
shares of stock he owned. They were given to him as part of an oral agreement
made in connection with the licensing agreement. Therefore, although the facts
establish that Yfantis was a shareholder in and an alleged officer/director of
Eye-Gate, they do not establish general jurisdiction over him in his individual
capacity. Accordingly, we hold that Yfantis's relationship with Eye-Gate did not
amount to the type of continuous and systematic contact with Texas that is
required for general jurisdiction. See Haught v. Agric. Prod. Credit Ass'n,
39 S.W.3d 252, 263 (Tex. App.--Tyler 2000, no pet.) (holding that defendant who
served as director, but was not authorized to sign checks and received no
compensation, was not subject to personal jurisdiction in Texas); Al-Turki
v. Taher, 958 S.W.2d 258, 263 (Tex. App.--Eastland 1997, pet. denied)
(holding that nonresident defendant's ownership of stock in Texas corporation
and participation in shareholder's meeting were not the type of continuous and
systematic contact with Texas required to subject him to general jurisdiction in
an unrelated action). We sustain Yfantis's second issue.
Specific Jurisdiction
Yfantis also complains that there is no
basis for specific jurisdiction over him. Balloun sued Yfantis claiming the
imposition of a constructive trust on any money he received from the $215,000
that Balloun loaned MCM in May 2000.(6) To
establish specific jurisdiction, Balloun's claim for a constructive trust must
arise out of or relate to Yfantis's contacts with the state. See Guardian
Royal, 815 S.W.2d at 227-28; Schlobohm, 784 S.W.2d at 358. In
determining whether any such contacts occurred, we look only to Yfantis's
relationship with Balloun and Texas. See Clark v. Noyes, 871 S.W.2d
508, 513 (Tex. App.--Dallas 1994, no writ); see also Guardian Royal,
815 S.W.2d at 228 (holding that specific jurisdiction minimum contacts focuses
on relationship among defendant, forum, and litigation).
The record is devoid of any evidence
showing that Yfantis had any contact with Balloun in the state. Consequently,
Balloun have attempted to establish specific jurisdiction over Yfantis by
relying on his contacts with MCM and Eye-Gate regarding the licensing agreement.
While these contacts might be sufficient to establish personal jurisdiction over
Yfantis in a suit for breach of the licensing agreement, they do not "arise
out of" or relate to Balloun's claim against Yfantis for a constructive
trust. Balloun was not even a party to the licensing agreement. Therefore,
Yfantis's contacts with Texas in relation to the licensing agreement are not
relevant to the issue of specific jurisdiction. See Shell Compania
Argentina De Petroleo, S.A. v. Reef Exploration, Inc., 84 S.W.3d 830, 838
(Tex. App.--Houston [1st Dist.] 2002, pet. filed) (holding that
agreements entered into by defendant that plaintiff was not a party to are not
relevant to a determination of specific jurisdiction); Garner, 966
S.W.2d at 803 (holding that contract negotiated between defendant and a third
party, not the plaintiff, could not form the basis for personal jurisdiction).
Balloun also contends that Yfantis's
acceptance of the check for $275,000 from Eye-Gate is sufficient contact to
establish specific jurisdiction. For several reasons, we disagree. First, the
check was made payable to SSAI and was hand-delivered to Yfantis in Nevada by
MCM's representatives. There is no evidence that Yfantis personally received any
of the funds from this check. Second, although the check was from Eye-Gate and
not MCM, the record shows that Yfantis was told that MCM and Eye-Gate were one
and the same. Further, the check was delivered to Yfantis by MCM's
representatives. Therefore, there was no reason for Yfantis to be suspicious of
the fact that the check was from Eye-Gate instead of MCM. Third, the check was
written by Eye-Gate to SSAI. Yfantis had no contact with Balloun regarding this
check. He did not know, nor did he have any reason to know, that the funds he
received from Eye-Gate had been borrowed from Balloun.(7)
Therefore, his acceptance of the check cannot form the basis for specific
jurisdiction. We sustain Yfantis's first issue.
Conclusion
Because there is no evidence to support
the trial court's conclusion that it had personal jurisdiction over Yfantis, we
reverse the trial court's judgment and render judgment dismissing the case
against Yfantis.(8)
 
                                                                     
JOHN CAYCE
                                                                     
CHIEF JUSTICE
 
PANEL A: CAYCE, C.J.; HOLMAN and GARDNER,
JJ.
DELIVERED: August 14, 2003

1. For simplicity, we will refer to Balloun and Rainier
collectively as "Balloun."
2. Sometime between February 2000 and May 2000, however,
the shell company's name changed from I-SIM to Tech Systems, Incorporated, and
then to Eye-Gate.
3. Yfantis had agreed to hold the check until Eye-Gate
could arrange for payment.
4. Balloun alleges that Yfantis made three trips to Texas.
The record, however, reveals only two trips. In March of 2001, Yfantis came to
Texas to see Eye-Gate's new building. Then, sometime in April or May of the same
year, he flew to Austin for a meeting with Eye-Gate and Prodigy.
5. In his deposition, Yfantis admitted that he had
destroyed all of his e-mails, correspondence, and long distance bills evidencing
communication and contacts with Eye-Gate and others in connection with his
business dealings after Eye-Gate breached the agreement. He also stated there
were no records of their correspondence via video telephone because it was
transmitted over the internet and no long distance fees applied. Balloun
contends that because Yfantis destroyed this evidence, it is entitled to a
presumption that this evidence supports the trial court's finding of personal
jurisdiction. We disagree. There is no indication in the record that Yfantis
knew or should have known that litigation would ensue at the time he destroyed
these records.
6. A constructive trust is an equitable remedy created by
the courts to prevent unjust enrichment. Medford v. Medford, 68 S.W.3d
242, 248 (Tex. App.--Fort Worth 2002, no pet.). To establish that a constructive
trust exists, the proponent must prove (1) breach of a special trust, fiduciary
relationship, or actual fraud; (2) unjust enrichment of the wrongdoer; and (3)
tracing to an identifiable res. Mowbray v. Avery, 76 S.W.3d 663, 681
n.27 (Tex. App.--Corpus Christi 2002, pet. denied).
7. Balloun relies on Ginther v. Taub to support
its contention that the trial court has specific jurisdiction over Yfantis. 675
S.W.2d 724 (Tex. 1984). In Ginther, however, the Supreme Court of Texas
merely held that a constructive trust could be applied against an unknowing
beneficiary of a fraud even though he is not the actual wrongdoer. Id.
at 728. This case did not deal with the issue of whether specific jurisdiction
in a constructive trust case could be based on a contract to which the appellee
was not a party.
8. In light of our determination that the trial court
lacks personal jurisdiction over Yfantis, we need not address the remaining
issues. See Tex. R. App. P. 47.1.